IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF KANSAS

| | |
|---|---|
| Justing Spiehs<br><br>                              Plaintiff<br><br>v.<br><br>Topeka & Shawnee County Public<br>Library<br>*<br>Greg Gaul,  in his individual capacity<br>*<br>Melissa    Stiehler,    in    her    individual<br>capacity<br><br>                              Defendants | Case No.    5:25-cv-4117 |

COMPLAINT

Plaintiff alleges as follows:

**JURISDICTION AND VENUE**

1. This action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in this District under 28 U.S.C. § 1391(b).

**PARTIES**

3. Plaintiff Justin Spiehs is a Kansas resident who regularly engages in peaceful political expression and civic advocacy in public forums.

4. Defendant Topeka & Shawnee County Public Library ("TSCPL") is an independent municipal entity and is a "person" subject to suit under § 1983 pursuant to Monell.

5. Defendant Greg Gaul was at all relevant times the Library's Safety and Security Supervisor and acted under color of state law. He is sued in his individual and official capacities.

1

6. Defendant Melissa Stiehler, upon information and belief, resides in Kansas and is a Loud Light staff member. Defendant Stiehler acted under color of state law by exercising delegated authority from TSCPL and jointly participating with Gaul and TPD officers in removing Plaintiff.

**STATEMENT OF FACTS**

**AUGUST 30, 2025 - LIBRARY INCIDENT**

7. There is video recording of these events which are incorporated by reference which demonstrates the plaintiff's silent and calm nonverbal expressive conduct and the defendants' respective actions described in this Complaint. The video evidence corroborates the allegations herein, as well as Dr. Justin Spiehs sworn statement attached to this Complaint. and both are incorporated by reference.

8. Dr. Justin Spiehs is a resident of Kansas who regularly engages in civic advocacy and public speech on matters of government accountability, policing, and public corruption. He exercises these rights by attending public locations, holding signs, recording public officials, and attempting to file crime reports when he believes crimes have been committed by government employees. He has no history of violence, threats, disorderly conduct, or self-harm. He never gave any indication that he was suicidal or was an imminent risk for suicide while in custody.

9. The Topeka & Shawnee County Public Library published use policy states

4) Prohibited Activities: Library meeting rooms and event spaces may not be used for any activity that is incompatible with the library environment or interferes with its operations. Examples of prohibited activities include but are not limited to weddings, anniversary celebrations, funerals, birthday parties, reunions, dances, private parties, trade shows, conventions, or pageants. However, the Sunroom in Claire's Courtyard may be used for parties that follow all other Library policies and

procedures.

5) Customer Conduct Policy: Those hosting meetings and events atthe library and their guests agree to abide by all policies and regulations relating to the use of library facilities and accept responsibility for any and all damages to the library building, contents and equipment normal wear and tear accepted.

10) Meeting Content: The Library neither approves nor disapproves of content, ideas or subject matter presented in meeting rooms and event spaces, and it does not accept responsibility for ensuring accuracy or presentation of all points of view.

11) Delegation: The Chief Executive Officer or designee is granted full authority to decide any exception to this Policy and to establish the procedures and fees necessary to implement

10. It publishes a Customer Conduct Policy which states in part the following:

Do not harass or threaten another person. This includes but is not limited to physical, sexual, or verbal abuse; using "fighting words;" throwing things; soliciting, selling, or campaigning; interfering with the free passage of others.

Do not engage in disorderly or disruptive behavior. This includes but is not limited to yelling, loud cell phone usage or playing audio equipment loudly; sleeping or loitering; being under the influence of drugs or alcohol; roughhousing; poor personal hygiene; bringing animals into the library with the exception of service animals or animals used in library sponsored programming.

Grievance Policy for Customer Suspension

When a member of the public is asked to leave the library and that person wishes to contest the action or request the length of time be shortened; the following, progressive steps may be taken:

1.Contact the Safety and Security Supervisor to address the grievance. The Safety and Security Supervisor has the authority, based on the facts of the incident, to adjust the length of time or to establish alternative responses to the initial incident. Should an agreement not be reached with the Safety and Security Supervisor;

2.Contact the Chief of Staff. The Chief of Staff has the authority, based on the facts of the incident, to adjust the length of time or to establish alternative responses to the initial incident.

Should an agreement not be reached with the Chief of Staff;

3.The Chief Executive Officer has ultimate authority to determine the final decision, based on the facts of the incident.

11. Loud Light executive Anita Alexander told Dr. Spiehs he was permanently

banned from all Loud Light meetings including those on public property. She stated

"It has come to our attention that you attended a Loud Light event on 3/31 with the

purpose of disrupting and detracting from the event. Our events are meant to engage and inform, and hateful disruption will never be tolerated. We are providing official notice that you are banned from attending all future Loud Light events. If we see you at an event, you will immediately be asked to leave. We will not hesitate to contact venue owners or other authorities to facilitate your removal."

12. On August 30, 2025, Dr. Spiehs went to the Topeka & Shawnee County Public Library to engage in peaceful First Amendment expression regarding a meeting organized by Loud Light. He brought with him anti-abortion signs. Upon arrival, he observed a TPD patrol vehicle already positioned near the front entrance of the library, even before he began holding signs. He entered a publicly accessible area and began silently displaying his signs.

13. Dr. Spiehs entered a publicly accessible area and began silently displaying his signs. A Loud Light staff member Melissa Stiehler, was conducting a First Amendment informational presentation for attendees shortly before his interaction with officers. During this presentation, Stiehler told her audience that "obscene gestures could get you removed from this location," referring to potential consequences for constitutionally protected gestures.

14. TSCPL vested Stiehler, as presenter, with apparent authority to identify allegedly 'improper' conduct and to trigger security responses, which staff followed."

15. Her statement to the audience that gestures 'could get you removed' reflected a role delegated to her by Library staff.

16. Hearing this, Dr. Spiehs briefly extended his middle finger as part of his silent

expressive conduct to demonstrate that such gestures are protected by the First Amendment. This demonstration was nonverbal, momentary, and not directed at any individual.

17. Stiehler intentionally directed Gaul to remove Plaintiff based on disagreement with Plaintiff's viewpoint, and Gaul acted on her direction without exercising independent judgment.

18. Shortly before this, and unbeknownst to plaintiff at the time, Library Safety and Security Supervisor Greg Gaul who was in the vicinity, appeared to coordinate with an individual later identified as TPD Lt. Jerry Monasmith, who was present in plain clothes.

19. Stiehler approached Gaul about plaintiff extending his finger and indicated to Gaul that he needed to do something about it. Gaul told he wasn't allowed to "do that with his finger" because it was "a gesture" and that if he did it again he would have to leave the library. Plaintiff asked Gaul what rule he was violating and received no clear explanation. Plaintiff then extended his middle finger again and Gaul told him "okay you can leave now." Plaintiff responded "I'm good."

20. Gaul then motioned with his hand to plain-clothes Lt. Monasmith, who was waiting in the hallway outside of the meeting room door. Monasmith then motioned to TPD officer Cowman, who was also waiting in the hallway, to remove plaintiff for trespassing.

21. Cowman entered the room, approached plaintiff, and instructed Plaintiff to leave the library or face going to jail. He was detained and exited the library area as

instructed In the parking lot, Plaintiff was given a no trespass citation. Gaul informed him he was banned from the library for 6 months and TPD officer Willyard informed plaintiff that if he returned to the library he would be arrested for trespassing.

22. No officer stated that Dr. Spiehs's sign or finger was disruptive. No officer said that his sign or finger violated any safety rule. No officer asked him to lower his voice or modify his conduct, nor did he engage in loud speech or physical movement suggesting a threat. He received a trespass citation for his silent expressive conduct.

23. The removal would not have occurred absent Stiehler's instruction and prompting.

24. Plaintiff was never notified of any appeal or grievance procedure.

25. Stiehler's statement that 'obscene gestures could get you removed from this location' demonstrated specific, advance knowledge of TSCPL's enforcement practices and removal authority. She did not state this as opinion or prediction, but as an authoritative announcement of the rules governing conduct in the library meeting room.

26. Upon information and belief, Stiehler possessed this knowledge because TSCPL officials briefed her before the presentation regarding what conduct would trigger removal and instructed her to notify security of any such conduct.

27. Stiehler's statement effectively announced to the audience that she had authority to determine what conduct warranted removal, and that library security would enforce her determinations. No TSCPL staff member present corrected this representation or asserted independent authority over removal decisions.

28. The fact that Gaul immediately enforced Stiehler's assessment without reference to any written policy, without independent evaluation, and consistent with Stiehler's advance announcement, demonstrates that TSCPL had vested her with decision-making authority over removals during her presentation.

29. TSCPL and Stiehler jointly administered the rules of conduct during the event, operating in coordinated fashion. Gaul's enforcement actions were undertaken in direct reliance upon Stiehler's assessment and directive.

30. By announcing removal rules, identifying conduct warranting removal, and directing security enforcement, Stiehler exercised governmental functions traditionally and exclusively performed by state actors, including: (a) interpreting and announcing rules governing conduct in public forums; (b) determining which speech and expressive conduct violates such rules; and (c) ordering the removal and exclusion of persons from public property.

31. Stiehler intended that Library security use its state authority to remove Plaintiff because of disagreement with his political viewpoint.

32. Prior to September 2025, Dr. Spiehs had interactions with Topeka Police Department ("TPD") and Shawnee County Department of Corrections ("SCDOC") personnel, including a June 14, 2025 arrest where staff recognized him and processed him without incident despite his refusal to answer discretionary intake questions. During the June 14, 2025 intake, he declined to answer non-identifying questions, but staff processed him normally, did not place him on suicide watch, did not strip him, and released him after several hours. On that June 14 date, Officers Bell and

Priest threatened suicide watch when he declined to answer non-identifying questions, but ultimately processed him without such measures.

33. On June 14, 2025, Dr. Spiehs had previously been arrested and taken to SCDOC for intake. During that June 14 intake, Officers Bell and Priest handled his processing. On June 14, he told these officers that he would answer only identifying questions.

34. On June 14, Officers Bell and Priest threatened him with being placed on suicide watch if he did not answer questions beyond identification. Despite these threats, he was not placed on suicide watch on June 14. He was not forcibly stripped at any time during the June 14 intake. He was not subjected to any form of isolation cell on June 14. He was not kept naked or denied medical care on June 14. He was processed normally and released within approximately three to four hours on June 14, despite not answering non-identifying questions. No staff member during the June 14 intake claimed he was suicidal or needed suicide watch. No mental-health professional was involved in the June 14 processing.

35. On September 8, 2025, Officers Bell and Priest recognized Dr. Spiehs immediately and stated, "That's the same guy who didn't want to answer our questions." He engaged in the exact same conduct on September 8 as he had on June 14—refusing to answer non identifying questions while agreeing to answer identifying questions. Unlike June 14, he was forcibly stripped, placed on suicide watch, held naked for sixteen hours, and denied medical care on September 8. No staff member articulated any difference in his conduct between the two dates that justified the drastically more

severe treatment on September 8.

36. As of September 2025, multiple SCDOC staff recognized Dr. Spiehs by appearance and prior interactions. On multiple occasions, he learned that TPD and SCDOC staff were aware of his public advocacy work and had discussed him internally. Beginning in late August 2025 and continuing into September 2025, he engaged in a series of First Amendment activities, including standing silently with signs criticizing TPD officers.

### COUNT I
### FIRST AMENDMENT – CONTENT & VIEWPOINT DISCRIMINATION
### (ALL INDIVIDUAL DEFENDANTS)

37. Plaintiff incorporates ¶¶1–34 as fully set forth.

38. Public libraries are designated public forums for peaceful expressive activity. Policies and enforcement must be viewpoint-neutral and content-neutral.

39. Plaintiff engaged in core political expression: silent sign-holding and a brief symbolic gesture on matters of public concern. This expression is protected speech.

40. Stiehler directed Gaul to remove Plaintiff because she disagreed with his anti-abortion message and his demonstration that symbolic gestures are constitutionally protected speech. Her directive was based on the content and viewpoint of Plaintiff's expression, not on any neutral disruption concern.

41. Gaul ordered Plaintiff to stop engaging in symbolic political expression and demanded he leave the Library because of the content and viewpoint of that expression.

42. Other expression occurring during the presentation was permitted. Plaintiff alone

was singled out based on the viewpoint and subject matter of his message.

43. Content- and viewpoint-based restrictions in a public forum are presumptively unconstitutional and must satisfy strict scrutiny. Defendants lacked any compelling interest and acted without evidence of disruption.

44. TSCPL is liable under Monell because the violation was caused by its policies, lack of standards, and ratification of Gaul's conduct.

**COUNT II**
**FIRST AMENDMENT – PRIOR RESTRAINT**
**(GAUL)**

45. Plaintiff incorporates all of the facts above as fully set forth

46. Gaul's instruction that Plaintiff was "not allowed" to make a symbolic gesture, and his threat of removal should Plaintiff repeat the gesture, constituted a prior restraint on future protected speech.

47. The Library's policies confer unbridled discretion, contain no notice of prohibited expressive conduct, and authorize removal without objective standards.

48. Prior restraints and standardless licensing schemes are presumptively unconstitutional.

**COUNT III**
**FOURTEENTH AMENDMENT – PROCEDURAL DUE PROCESS\*\***
**(GAUL AND TSCPL)**

49. Plaintiff has a liberty interest in accessing a public library and engaging in lawful expressive activity in a public forum.

50. Gaul removed Plaintiff and caused issuance of a no-trespass notice without:

a. notice of prohibited conduct,
b. reference to any rule, policy, or standard,

10

c. opportunity to be heard, or

d. any established procedure.

51. TSCPL maintains no procedures, appeal mechanisms, or standards governing removal or trespass actions based on expressive conduct.

52. The deprivation of liberty without notice or hearing violates the Fourteenth Amendment.

**COUNT IV**
**FOURTEENTH AMENDMENT – SUBSTANTIVE DUE PROCESS (VAGUENESS)**
**(AGAINST TSCPL)**

53. Plaintiff incorporates all of the facts above as fully set forth

54. TSCPL's policies prohibit "disruptive," "disorderly," "improper," or "not respectful" conduct but do not define these terms or identify what expressive conduct is prohibited.

55. Undefined terms and total absence of standards fail to give fair notice and permit arbitrary, discriminatory enforcement—particularly against speech.

56. The policies are unconstitutionally vague on their face and as applied.

**COUNT V**
**FOURTEENTH AMENDMENT – EQUAL PROTECTION (CLASS-OF-ONE)**
**(ALL INDIVIDUAL DEFENDANTS)**

57. Plaintiff incorporates all of the facts above as fully set forth

58. Plaintiff was similarly situated to all other attendees and patrons participating in expressive activity.

59. Stiehler singled out Plaintiff for removal while ignoring or permitting other attendees who engaged in expressive conduct during the presentation. She treated Plaintiff differently than similarly situated attendees based solely on disagreement

11

with his message.

60. Gaul singled Plaintiff out for removal even though other attendees engaged in expressive conduct and were not removed.

61. There was no rational basis for treating Plaintiff differently. The distinguishing factor was the content and viewpoint of Plaintiff's political speech.

62. Arbitrary, differential treatment lacks even a rational basis and violates Equal Protection.

### COUNT VI
### MONELL LIABILITY
### (AGAINST TSCPL)

63. Plaintiff incorporates all of the facts above as fully set forth

64. The constitutional violations above were caused by TSCPL's policies, customs, and failures, including:

a. maintaining vague, standardless policies;

b. granting staff unbridled discretion to remove speakers;

c. failing to train staff on First Amendment limits in public forums;

d. ratifying Gaul's speech-based removal and no-trespass action; and

e. maintaining a custom of removing patrons based on disfavored speech without evidence of disruption.

65. These policies and customs were the moving force behind the violations.

### COUNT VII - CONSPIRACY (§ 1983)
### (AGAINST INDIVIDUAL DEFENDANTS)

66. Plaintiff incorporates all preceding paragraphs.

67. Upon information and belief based on the coordinated conduct described above, Gaul and Stiehler reached a mutual understanding to deprive Plaintiff of his constitutional rights based on the viewpoint of his expression.

12

68. Stiehler announced to the audience that gestures could result in removal, establishing the rule she would enforce.

69. When Plaintiff engaged in the gesture, Stiehler approached Gaul and directed him to take action.

70. Gaul immediately complied with Stiehler's directive without independent evaluation, consistent with their understanding.

71. Their coordinated conduct resulted in Plaintiff's removal, six-month ban from the library, and further police bias resulting in subsequent civil rights violations described in Dr. Spiehs' sworn statement.

72. Each defendant was a willful participant in joint activity with the other to accomplish the deprivation of Plaintiff's constitutional rights.

**PRAYER FOR RELIEF**

Plaintiff requests:

A. Compensatory damages

B. Nominal damage

C. Declaratory relief that TSCPL's policies and Gaul's conduct violated the First and Fourteenth Amendments.

D. Injunctive relief against TSCPL prohibiting speech-based removals absent evidence of material disruption, and requiring constitutionally adequate standards and training.

E. Vacatur of the trespass notice.

F. Punitive damages,

G. Costs and attorney's fees under 42 U.S.C. § 1988.

H. Any further relief deemed just.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

.

> By:/s/Linus L. Baker
> Linus L. Baker KS 18197
> 6732 West 185th Terrace
> Stilwell, Kansas 66085-8922
> 913.486.3913
> 913.232.8734 (fax)
> E-Mail: linusbaker@prodigy.net
> Attorney for the plaintiff

## Verified Sworn Statement

**1.** My name is Dr. Justin Spiehs.  I, Justin Spiehs, am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and know the contents thereof. The allegations of fact contained in the Complaint and below are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct. I have personal knowledge of the allegations of fact contained in this lawsuit.  I have videos of events insofar as I was allowed to record. Plaintiff verifies that the allegations stated in the third person are his own and are true.   Plaintiff includes subsequent encounters with Topeka Police Department officers to demonstrate bias, pattern, and practice. These incidents show that TPD personnel recognized Plaintiff from his public advocacy, referenced his prior expressive activity, and subjected him to harsher treatment than similarly situated individuals. The inclusion of these facts is not to expand the scope of claims beyond the Library incident, but to establish that Defendants' actions were part of a broader course of viewpoint-based discrimination and retaliatory enforcement. These encounters further evidence a municipal policy or custom of targeting Plaintiff's expressive conduct, relevant to Monell liability, equal protection, and the credibility of Defendants' asserted justifications.

## AUGUST 30, 2025 - LIBRARY INCIDENT

**2.** Dr. Justin Spiehs is a resident of Kansas who regularly engages in civic advocacy and public speech on matters of government accountability, policing, and public corruption. He exercises these rights by attending public locations, holding signs, recording public officials, and attempting to file crime reports when he believes crimes have been committed by government employees. He has no history of violence, threats, disorderly conduct, or self-harm. He never gave any indication that he was

suicidal or was an imminent risk for suicide while in custody.

**3.** On August 30, 2025, Dr. Spiehs went to the Topeka & Shawnee County Public Library to engage in peaceful First Amendment expression. He brought with him anti-abortion signs. Upon arrival, he observed a TPD patrol vehicle already positioned near the front entrance of the library, even before he began holding signs. He entered a publicly accessible area and began silently displaying his signs.

**4.** Dr. Spiehs entered a publicly accessible area and began silently displaying his signs. A Loud Light staff member Melissa Stiehler, was conducting a First Amendment informational presentation for attendees shortly before his interaction with officers. During this presentation, Stiehler told her audience that "obscene gestures could get you removed from this location," referring to potential consequences for constitutionally protected gestures. Hearing this, he briefly extended his middle finger as part of his silent expressive conduct to demonstrate that such gestures are protected by the First Amendment. This demonstration was nonverbal, momentary, and not directed at any individual.

**5.** Shortly before this, and unbeknownst to plaintiff at the time, Library Safety and Security Supervisor Greg Gaul who was in the vicinity, appeared to coordinate with an individual later identified as TPD Lt. Jerry Monasmith, who was present in plain clothes.

**6.** Stiehler approached Gaul about plaintiff extending his finger and indicated to Gaul that he needed to do something about it. Gaul told he wasn't allowed to "do that with his finger" because it was "a gesture" and that if he did it again he would have to leave the library. Plaintiff asked Gaul what rule he was violating and received no clear explanation. Plaintiff then extended his middle finger again and Gaul told him "okay you can leave now." Plaintiff responded "I'm good."

**7.** Gaul then motioned with his hand to plain-clothes Lt. Monasmith, who was waiting in the hallway outside of the meeting room door. Monasmith then motioned to TPD officer Cowman, who was also waiting in the hallway, to remove plaintiff for trespassing.

**8.** Cowman entered the room, approached plaintiff, and instructed Plaintiff to leave the library or face going to jail. He was detained and exited the library area as instructed In the parking lot, Plaintiff was given a no trespass citation. Gaul informed him he was banned from the library for 6 months and TPD officer Willyard informed plaintiff that if he returned to the library he would be arrested for trespassing.

**9.** No officer stated that Dr. Spiehs's sign or finger was disruptive. No officer said that his sign or finger violated any safety rule. No officer asked him to lower his voice

or modify his conduct, nor did he engage in loud speech or physical movement suggesting a threat. He received a trespass citation for his silent expressive conduct.

**10.** Prior to September 2025, Dr. Spiehs had interactions with Topeka Police Department ("TPD") and Shawnee County Department of Corrections ("SCDOC") personnel, including a June 14, 2025 arrest where staff recognized him and processed him without incident despite his refusal to answer discretionary intake questions. During the June 14, 2025 intake, he declined to answer non-identifying questions, but staff processed him normally, did not place him on suicide watch, did not strip him, and released him after several hours. On that June 14 date, Officers Bell and Priest threatened suicide watch when he declined to answer non-identifying questions, but ultimately processed him without such measures.

**11.** On June 14, 2025, Dr. Spiehs had previously been arrested and taken to SCDOC for intake. During that June 14 intake, Officers Bell and Priest handled his processing. On June 14, he told these officers that he would answer only identifying questions. On June 14, Officers Bell and Priest threatened him with being placed on suicide watch if he did not answer questions beyond identification. Despite these threats, he was not placed on suicide watch on June 14. He was not forcibly stripped at any time during the June 14 intake. He was not subjected to any form of isolation cell on June 14. He was not kept naked or denied medical care on June 14. He was processed normally and released within approximately three to four hours on June 14, despite not answering non-identifying questions. No staff member during the June 14 intake claimed he was suicidal or needed suicide watch. No mental-health professional was involved in the June 14 processing.

**12.** On September 8, 2025, Officers Bell and Priest recognized Dr. Spiehs immediately and stated, "That's the same guy who didn't want to answer our questions." He engaged in the exact same conduct on September 8 as he had on June 14—refusing to answer non identifying questions while agreeing to answer identifying questions. Unlike June 14, he was forcibly stripped, placed on suicide watch, held naked for sixteen hours, and denied medical care on September 8. No staff member articulated any difference in his conduct between the two dates that justified the drastically more severe treatment on September 8.

**13.** As of September 2025, multiple SCDOC staff recognized Dr. Spiehs by appearance and prior interactions. On multiple occasions, he learned that TPD and SCDOC staff were aware of his public advocacy work and had discussed him internally. Beginning in late August 2025 and continuing into September 2025, he engaged in a series of First Amendment activities, including standing silently with signs criticizing TPD officers.

## SEPTEMBER 5, 2025 - FIRST POLICE STATION INCIDENT

**14.** On September 5, 2025, Dr. Spiehs went to the Topeka Police Department to engage in protected expressive conduct by displaying signs with the names of TPD officers, criticizing their actions, and to record officers conducting their police duties. He entered the public lobby of the Topeka Police Department.

**15.** Officers Jones and Anderson approached Dr. Spiehs. Jones and Anderson asked him to explain his "police business." He remained calm and declined to answer.

**16.** He stood still with his signs and recorded officers from a distance. Anderson and Jones informed him he could not remain in the lobby unless he answered their questions. He declined to respond and asked to know the statute requiring him to answer.

**17.** Officers did not cite any statute, rule, or policy requiring Dr. Spiehs to answer. Officers told him: "If you do not have police business to conduct, you will have to leave the police station and if you don't leave you will be cited." He remained silent.

**18.** Jones and Anderson detained Dr. Spiehs by restricting his movement within the lobby and refusing to allow him to leave freely. He asked multiple times if he was being detained; officers informed him he was and they began to write a citation for disobeying a lawful police order to leave the police station.

**19.** Dr. Spiehs explained to the officers that he was in a public building, in a public lobby, engaging in constitutionally protected expression, and filming as a journalist.

**20.** After several minutes, TPD LT Ekis arrived. Ekis asked him a few simple questions about whether he had legitimate "business." He responded that he did. Ekis then stated in the presence of Jones and Anderson that "we have no reason to detain him." Jones and Anderson ceased the detention only after Ekis intervened.

**21.** Dr. Spiehs left the station voluntarily, believing the issue resolved. He was not arrested or cited on September 5.

**22.** Officers gave him no warning that returning to the station to report crimes or conduct other public business including filming would result in arrest. He left with the understanding that expressive activity including filming in the lobby were allowed as "business."

## SEPTEMBER 8, 2025 - SECOND POLICE STATION INCIDENT AND ARREST

**23.** On September 8, 2025, Dr. Spiehs returned to the Topeka Police Department

lobby. He carried a printed copy of K.S.A. 21-5922 (Interference with the Conduct of Public Business) and intended to file a criminal charge against Officers Jones and Anderson based on their conduct on September 5.

**24.** He entered the public lobby calmly, did not raise his voice, and stood peacefully near the public counter. He informed Officer Baker that he was there to file a criminal charge. Officer Baker told him the department would not take a criminal charge from him and offered only a complaint form.

**25.** Dr. Spiehs asked to speak to a supervisor. Sgt. Anderson—the same officer he was attempting to charge—came to the lobby. He again stated that he wished to file a criminal charge. Anderson refused to accept the charge.

**26.** Dr. Spiehs raised his phone to shoulder height to record the interaction clearly. Major Russell Klumpp, Assistant Chief of Police, entered the lobby to speak with him.

**27.** Klumpp immediately began arguing about whether Dr. Spiehs was an "invitee" under the statute. He answered calmly while holding his phone at a safe distance and at a non-threatening angle.

**28.** Dr. Spiehs answered calmly while holding his phone at a safe distance and at a non-threatening angle. Klumpp immediately began arguing about whether he was an "invitee" under the statute.

**29.** Klumpp extended both arms toward Dr. Spiehs in a rapid stopping motion that came within inches of his chest. Dr. Spiehs took a step back and said, "You really escalated there." As he continued recording, Klumpp stepped aggressively toward him a second time with a menacing facial expression: brow furrowed, eyes narrowed, chin tucked, forehead angled downward. He came within inches of making contact with Dr. Spiehs.

**30.** Klumpp asked in an intimidating tone: "Do you have police business to be done here?" Dr. Spiehs stated, "Don't step towards me like that again, Klumpp." Klumpp took another step toward him, causing Dr. Spiehs to step backward to avoid physical contact. He feared Klumpp was losing emotional control.

**31.** Klumpp ordered Dr. Spiehs to leave the lobby. He asked, "Am I being detained?" Klumpp replied: "Yes, now you are."

**32.** After Major Klumpp stated "Yes, now you are," officers approached Dr. Spiehs. He asked which statute he had violated; no officer answered.

**33.** Klumpp instructed Dr. Spiehs to turn around and place his hands behind his back. They placed handcuffs on his wrists. He immediately felt sharp pain due to the tightness of the restraints. He told the officers: "These cuffs are too tight." No officer

adjusted the restraints despite his repeated statements.

**34.** Dr. Spiehs walked under his own power with the officers toward the exit of the police department. He was escorted outside where a transport vehicle was waiting.

**35.** Dr. Spiehs entered the back of the transport vehicle without resistance. During transport, he experienced increasing pain in his wrists from the overly tight handcuffs. He asked the transporting officer to loosen the restraints. The officer did not adjust them. No officer asked whether he had any medical conditions or needed medical attention.

**36.** Dr. Spiehs remained seated as the vehicle proceeded toward SCDOC. He remained calm. The transport officer reported no safety concerns or behavioral issues with him.

**37.** On September 8, 2025, Dr. Spiehs stood silently inside the Topeka Police Station in Topeka, Kansas, holding a sign critical of TPD officers. He recorded on his phone the entire time he was in the police station. He also attempted to file a criminal complaint on two TPD officers – Jones and Anderson – for interfering with his public business in a public building on September 5th, 2025. He did not block foot traffic, or interfere with any official duties. He attempted to give the criminal report to Major Russ Klumpp. Klumpp refused to take the report and told plaintiff to leave the police station and then told him he was being arrested for disobeying a lawful police order. He did not resist arrest. Klumpp and SGT Austin placed him in handcuffs and transported him to the Shawnee County Department of Corrections.

### SEPTEMBER 8, 2025 - SCDOC ARRIVAL AND INTAKE

**38.** Dr. Spiehs arrived at SCDOC in the afternoon hours of September 8, 2025. He exited the vehicle under escort. Several SCDOC staff members were gathered near the intake area at the time of his arrival.

**39.** Dr. Spiehs recognized Officers Bell and Priest from his June 14, 2025 intake. He overheard Bell and Priest say to each other, "That's the same guy who didn't want to answer our questions." Their tone indicated familiarity with him from the June 14 incident.

**40.** He was led into the intake hallway. A nearby physical struggle erupted between an inmate and Officer Bell close to where he was standing. He stepped backward with his hands visible to avoid appearing involved in the altercation. Officers quickly separated the other inmate from staff.

**41.** Immediately after the incident, an SCDOC sergeant approached Dr. Spiehs. Without explanation, the sergeant directed staff to place him into Cell 4C. He was

escorted to the cell. He asked staff why he was being placed inside. Staff did not answer. The cell door was closed and locked.

**42.** Dr. Spiehs remained inside Cell 4C for approximately ninety minutes. While confined there, he observed that multiple detainees who arrived after him were processed ahead of him. He asked through the door, "Why am I being kept in here?" A guard replied, "The sergeant ordered us to keep you in the cell."

**43.** Dr. Spiehs was not told he was on suicide watch, nor did any staff ask him any mental-health questions during this period. He waited inside Cell 4C until SCDOC staff returned to begin the intake process.

**44.** After approximately ninety minutes in Cell 4C, SCDOC staff opened the door and instructed Dr. Spiehs to step into the hallway. He asked again why he had been held in the cell while others were processed before him. Staff did not answer. He walked calmly to the intake counter.

**45.** Dr. Spiehs fully cooperated with the intake procedure except where questions exceeded identifying information. Staff asked for his name, date of birth, and address, which he provided. He also provided his mug shot. He declined to answer additional questions beyond identification and stated that he did not believe he was legally required to answer non-identifying questions.

**46.** Staff informed Dr. Spiehs that answering "all" intake questions was necessary for processing. He stated he was willing to answer all identifying questions but not discretionary questions. No staff member told him what statute or regulation required him to answer discretionary questions. No staff member told him he was a suicide risk. No staff member told him he had exhibited any behavior consistent with self-harm. He stood calmly at the intake counter.

**47.** Officers Bell and Priest stood nearby during intake. Dr. Spiehs overheard Bell and Priest say, in reference to his silence, "That's the same guy who didn't want to answer our questions," repeating the phrase from earlier. He observed that Bell and Priest were referencing the June 14, 2025 intake encounter. Their tone indicated irritation and recognition rather than any concern for his safety.

**48.** No one asked Dr. Spiehs whether he was experiencing suicidal ideation or thoughts of self-harm. No one administered a suicide-screening questionnaire. No licensed mental-health professional had evaluated him at any point that day.

**49.** A woman in plain attire approached Dr. Spiehs and said she was "a mental health worker." She told him: "I'm going to ask you some questions, and if you don't want to answer them, you don't have to. Do you want to answer my questions?" He remained silent. He did not say he would not answer questions; he simply did not answer. The

woman immediately turned to SCDOC staff and stated, "He said he doesn't want to answer my questions." Dr. Spiehs spoke up, responding, "That's a lie. I never said that. I did not say I won't answer your questions. I didn't answer at all." Staff ignored his correction.

**50.** Immediately after the fabricated statement, Nurse Jane Doe said in a raised voice, "He can take his ass to suicide watch then." Her tone indicated irritation, not clinical concern. Dr. Spiehs had not exhibited any self-harm behavior and had not expressed any words indicating suicidal ideation. No one conducted a suicide assessment. No mental-health professional evaluated him. No staff member asked him any follow-up questions after the alleged mental-health worker left.

**51.** Dr. Spiehs heard multiple SCDOC staff discussing his silence as a reason for punitive measures. One staff member, in his presence, stated, "Bond is stopped unless he answers." He understood this to mean that he would be held longer unless he answered discretionary questions.

**52.** Dr. Spiehs asked for the legal authority requiring him to answer discretionary questions. No staff member provided such authority. He asked whether refusing to answer discretionary questions was grounds for punishment. Staff did not respond. Staff began discussing his processing in terms of compliance with their questioning rather than any safety concern.

**53.** Dr. Spiehs heard staff say, "He's going to be in there until he sees the judge." He asked, "In where?" Staff did not answer. He again stated that he was willing to answer all identifying questions. No staff member explained how refusing non-identifying questions constituted a safety or mental-health issue. He saw no documentation, form, screening sheet, or checklist pertaining to suicide watch.

**54.** At this stage, no staff member stated that Dr. Spiehs was being evaluated under any suicide-prevention policy. He saw no mental-health forms on the counter. No staff member told him that SCDOC policy required assessments at any particular frequency.

**55.** Dr. Spiehs later learned from a morning-shift nurse that SCDOC policy required mental-health checks approximately every two hours for individuals on suicide watch. He had not received any such checks at any time.

**56.** Following the fabricated statement by the alleged mental-health worker, staff conferred privately nearby. Dr. Spiehs overheard one staff member say, "Just take him back there then."

**57.** At SCDOC intake, Dr. Spiehs again provided his name and date of birth. He declined to answer non-identifying questions, including questions about employment,

education, and religious affiliation. Officers Bell and Priest told him that if he did not answer the questions, he would be placed on suicide watch. He stated that he had not given any indication that he was suicidal He asked to speak with a supervisor. Bell and Priest refused. He asked to make a phone call. Bell and Priest refused.

**58.** Dr. Spiehs was not told that he would be stripped. He was not told that he would be placed in isolation. He was not told how long he would be held.

## SEPTEMBER 8, 2025 - FORCED STRIPPING PROCEDURE

**59.** While Dr. Spiehs was still at the intake area, multiple officers were summoned, including Sgt. White. White approached from a back hallway and staff deferred to him as the supervising decision-maker. White told him, "A cell has been prepared for you." Dr. Spiehs asked what that meant. White stated he was "going on suicide watch." He asked, "For what reason?" White told him told him because he was not compliant with answering questions.  White told him, "You can go voluntarily, or you will be forced." Dr. Spiehs stated he did not consent.

**60.** White turned to Officer Bell and said, "Get the camera." Bell retrieved a handheld camera and activated it. Multiple staff members began converging, including Officers Lillo, Stanley, Lige, and several staff in medical attire.

**61.** White then commanded Dr. Spiehs, "Put your hands behind your back!" He complied immediately. White ordered, "Turn around!" and he turned around at once. White then shouted again, louder, "Turn around!" Dr. Spiehs responded, "I am turned around," but White continued escalating. He perceived White's escalating tone as an attempt to manufacture a false narrative of non-compliance. White approached him aggressively, and Bell continued filming. White then violently handcuffed plaintiff's hands behind his back.

**62.** White ordered Lillo and Stanley to escort Dr. Spiehs to the medical wing. He walked voluntarily, with his hands cuffed behind his back as instructed. The group passed by an open cell where he saw an inmate mopping a wet floor under guard supervision. He observed no cleaning agents or water being used and inferred the floor had recently contained bodily fluids. The inmate and guard exited the cell as he approached.

**63.** White ordered Lillo and Stanley to place Dr. Spiehs in the same cell. He asked for water, stating he had not received any during several hours in custody. Lillo responded that he could have water later. Dr. Spiehs remained compliant.

**64.** Upon entry into the cell, Dr. Spiehs immediately noticed a strong foul odor. The floor was wet and sticky. Without provocation, Lillo and Stanley pinned him face-forward against the wall while his arms were handcuffed behind his back. He did not

resist. White positioned himself on his right side and applied a pain-compliance technique to his fingers and wrists. Dr. Spiehs cried out in pain.

**65.** Dr. Spiehs asked White, "Give me a lawful order to comply with to get you to stop hurting me." White did not provide any order he could comply with to make the pain stop. White instructed Lillo and Stanley in a manner suggesting they were being trained on the process. Dr. Spiehs perceived the interaction as instructional in nature.

**66.** White said, "I'm going to ask you this one time: are you willing to strip naked voluntarily, or are you going to make us do it?" Dr. Spiehs asked why such action was required. White responded, "Okay then." White paused briefly before giving a signal. Officer Lige stepped forward and adopted a calm tone, telling him that he "hadn't complied" and should "make it as easy as possible." Dr. Spiehs stated loudly, "I have given you no indication whatsoever I am suicidal. I do not consent to this." Lige then stepped aside.

**67.** White shouted, "Stop resisting!" despite Dr. Spiehs not resisting. Lillo and Stanley tightened their grip on his arms. Bell continued filming from the doorway. Several female staff members in medical attire and other clothing stood watching from the doorway. No staff member objected or attempted to stop White's actions.

**68.** Immediately after Dr. Spiehs declined to answer non-identifying questions at intake on September 8, 2025, a jail nurse stated, in a raised and agitated tone, "He can take his ass to suicide watch then," making clear that his silence—not any safety concern—was the basis for the action. The nurse's statement was made in the presence of multiple corrections staff and was treated by staff as an instruction to begin punitive measures against him. The timing and wording of the nurse's statement communicated a direct cause-and-effect relationship: his refusal to answer questions would result in his placement on suicide watch.

**69.** Officer Bell told staff that "bond is stopped unless he answers," explicitly conditioning Dr. Spiehs's release on compelled verbal responses to non-identifying intake questions. Bell's statement was made while he stood in the booking area, surrounded by multiple officers, with no mental-health screening or safety concern having been raised. Staff informed him that he would be kept in a locked cell "because he didn't answer our questions," expressly identifying silence—not any observation of danger—as the reason for confinement. At no time did any staff member state that he had expressed suicidal thoughts, appeared suicidal, or displayed any behavior suggesting a self-harm risk.

**70.** Instead, staff repeatedly stated that Dr. Spiehs's continued detention, cell placement, and movement restrictions were "because he wouldn't answer," or words

to that effect. During the forced-stripping incident, Sgt. White stated that he "had caused this" by refusing to answer intake questions, directly linking the violent and degrading treatment to his protected silence. White made this statement in a tone indicating blame and retribution, not medical necessity. Another officer told him, "This is what happens when you don't answer," further confirming the punitive motive. The repeated statements by staff demonstrated that his forced removal of clothing, physical handling by officers, and placement in an isolated cell were consequences intentionally imposed because he refused to speak.

71. A female guard told Dr. Spiehs that if he did not answer questions for the mental health worker, "you're not going anywhere," communicating that the purpose of the suicide-watch process was to compel speech. Another officer stated that he would remain in the cell "until you talk to them," reinforcing that his continued confinement was retaliatory and coercive, not based on clinical need. When he continued to decline to answer, staff informed him he would stay in the cell "until you see a judge," extending the threat beyond suicide watch and making clear there was no objective assessment driving the decision.

72. During the morning supervisory check, a bearded sergeant told Dr. Spiehs that the reason he remained in the cell was that he "hadn't complied with answering their questions," expressly acknowledging that his continued confinement was punishment for silence. The sergeant also told him, "You're arguing again and not complying just like you did when you got arrested for disobeying police," confirming staff viewed his refusal to answer questions as a disciplinary infraction to be punished. At no point did staff state that his silence indicated suicidal ideation; instead, they treated silence as defiance to be corrected with escalating coercion and physical punishment.

73. Officer Jackson, while posted outside Dr. Spiehs's suicide-watch cell, whispered to him, "Do whatever you need to do to get out of this situation in the morning," indicating that staff understood—and Jackson admitted—that compliance with answering questions, not medical need, was the sole path out of confinement. Jackson's whispered comment demonstrated both (a) knowledge that his treatment was improper, and (b) recognition that the purpose of the suicide-watch placement was to coerce him into answering questions, not to address suicide risk. When he was locked in Cell 4C earlier that evening, a corrections officer informed him through the cell door that "the sergeant ordered us to keep you in the cell," and provided no reason other than his refusal to answer questions.

74. When Dr. Spiehs was finally removed from Cell 4C and asked staff what that prolonged confinement was about, a female corrections officer responded that "our sergeant told us to keep you in there," again identifying supervisory retaliation as the

reason. At no point during this period did any staff member claim that he posed a safety risk or suicide risk requiring isolation. No staff member stated that he had exhibited any signs of self-harm, suicidal statements, or behavioral indicators suggesting suicide watch was clinically required. Every explanation provided to him by staff, including supervisory staff, identified his refusal to answer questions as the reason for both his locked-cell confinement and his continued detention.

**75.** Dr. Spiehs was then escorted to the medical-wing cell by multiple officers, including Sgt. White, Lillo, Stanley, and Bell. Once inside the medical-wing cell area, the officers positioned themselves at the door and informed him that he would be forced onto suicide watch because he had refused to answer questions. He remained fully compliant with all physical instructions, stood still, and offered no physical resistance. He was placed in a position where he was surrounded by multiple corrections officers, including Sgt. White, who took control of the encounter.

**76.** As the officers prepared to strip Dr. Spiehs, none stated that the procedure was being conducted for medical reasons or out of concern that he might self-harm. Instead, officers repeatedly referenced his silence, making clear that their purpose was disciplinary and coercive. At no time prior to the forced stripping did any staff member attempt to perform a suicide-risk evaluation or ask whether he was suicidal. At no time did any mental-health professional recommend forced stripping or suicide watch. No corrections officer requested mental-health approval for placing him on suicide watch before ordering the stripping procedure. No suicide-prevention protocol was read, referenced, or consulted before officers physically seized and stripped him.

**77.** During the forced-stripping procedure, multiple staff members were physically present in the small medical-wing cell and observed everything that took place. Officers Lillo and Stanley each held one of Dr. Spiehs's arms pinned against the wall while Sgt. White conducted the stripping. Lillo maintained a firm hold on his left arm, keeping it immobilized while White manipulated his body. Stanley maintained a firm hold on his right arm in the same manner. Neither Lillo nor Stanley attempted to prevent Sgt. White from applying pain-compliance techniques to his hands, fingers, wrists, or forearms.

**78.** Neither officer attempted to intervene when Sgt. White loudly and repeatedly yelled "Stop resisting!" even though Dr. Spiehs was not resisting. Neither officer objected or attempted to intervene when White forcibly removed his clothing. Officer Lige remained positioned near him and had a clear view of the entire encounter. Lige spoke to him in a soft tone that contrasted with White's yelling but did not attempt to stop or slow the force being used. Lige acknowledged to him that the stripping was inevitable because he "hadn't complied" with answering questions. Lige did not raise

any objection when White escalated to shouting and physically manipulating his body.

**79.** Officer Bell stood in the doorway holding a handheld video camera, recording the forced stripping. Bell maintained a clear, uninterrupted view of the encounter as Sgt. White removed Dr. Spiehs's clothing. Bell did not attempt to intervene or object to the force being used, despite being in a supervisory or documentation role.

**80.** Approximately four to six female staff members stood in the cell doorway, observing the forced stripping from several feet away. These female staff members had a clear and unobstructed view of Dr. Spiehs during the entire procedure. They observed him being forcibly positioned against the wall, handcuffed, and immobilized by multiple male officers. They observed Sgt. White applying force to his hands, fingers, and arms. They observed him being forcibly relieved of his clothing. They observed that he was visibly distressed, in pain, and shouting for officers to give him a lawful order he could follow and that he had not given any indication that he was suicidal and that he did not consent to what was taking place.

**81.** None of the female staff members attempted to intervene or express concern. None questioned why Dr. Spiehs had been brought to the medical-wing cell without any suicide-risk evaluation. None asked why his clothing was being forcibly removed despite his lack of resistance and the lack of any medical justification. None left, turned away, or voiced discomfort about observing his forced stripping. Their collective silence, continued presence, and failure to intervene conveyed tacit approval of the procedure and contributed to the coercive environment.

**82.** Officer Lige remained stationed near the cell door during much of the forced stripping and could clearly observe Sgt. White's actions toward Dr. Spiehs. Lige heard him repeatedly state that he was not resisting and repeatedly ask officers to provide a lawful order he could comply with. Lige heard him shout that he had given no indication of being suicidal. Lige heard him shout that the stripping was unnecessary and non-consensual. Despite this, Lige did not call for a supervisor to reassess the situation, did not object, and did not intervene in any way.

**83.** Later, a nurse standing nearby made a remark referring to Dr. Spiehs's exposed condition in a joking or mocking tone, indicating no one present perceived the procedure as medically necessary. Lige reacted to the nurse's comment by acknowledging that cameras were recording but indicated she did not care, demonstrating awareness of how the conduct would appear on video. Lige did not direct the nurse to stop commenting. Lige did not report the nurse's conduct. Lige did not attempt to stop the stripping even though she had authority to call other staff or supervisors.

**84.** Officer Jackson, who later stood post outside Dr. Spiehs's suicide-watch cell, was not in the stripping cell but became aware of the events from his statements and staff discussions. Jackson observed his physical condition after the stripping, including his difficulty moving his arms and hands. Jackson heard him describe what had been done and heard his repeated requests for medical attention. Jackson had the authority to summon medical staff and did attempt to notify them, but no medical examination occurred for over five hours afterward. Jackson's failure to escalate the matter to higher supervision allowed the continuing denial of medical care. Officers Bender and Stanley, who also rotated on post outside Dr. Spiehs's suicide-watch cell, observed his condition through the cell window. Bender and Stanley heard his repeated statements that his wrists, hands, and back were injured from the force used during the stripping. Bender observed him struggling to lift the heavy safety blankets due to pain. Bender did not take steps to secure medical treatment. Bender and Stanley did not question why he had received no suicide-risk assessment despite being on suicide watch.

**85.** Officer Lige remained stationed near the cell door during much of the forced stripping and could clearly observe Sgt. White's actions toward Dr. Spiehs. Lige heard him repeatedly state that he was not resisting and repeatedly ask officers to provide a lawful order he could comply with. Lige heard him shout that he had given no indication of being suicidal. Lige heard him shout that the stripping was unnecessary and non-consensual. Despite this, Lige did not call for a supervisor to reassess the situation, did not object, and did not intervene in any way.

**86.** After the forced stripping, Sgt. White directed officers to pull Dr. Spiehs backwards toward the cell door while his hands remained handcuffed behind him. He was moved backward in a manner that caused him to lose balance and stumble. Officers ordered him to "stick [his] arms out" through the metal portal on the cell door so they could remove the cuffs. He informed officers that he could not bend down due to pain in his back and arms. Despite this, officers forcibly pulled his arms downward through the narrow portal opening, causing him to crouch in a painful, unnatural position. Officers manipulated his arms in a way that caused additional pain to his wrists, hands, and spinal area.

**87.** Once the cuffs were removed, the officers shoved Dr. Spiehs forward into the cell, causing him to lurch toward the back wall. Officers then closed the portal and locked it. They told him he would remain in the cell "until you see a judge in the morning." Officers then walked away, leaving him fully exposed, without clothing, and without any medical attention.

**SEPTEMBER 8-9, 2025 - OVERNIGHT CONFINEMENT IN SUICIDE**

## WATCH CELL

**88.** Dr. Spiehs immediately noticed the cell was extremely cold. The cell lights remained on continuously and were bright enough to illuminate the room all night. He observed that the floor was wet and sticky from the substance that had been smeared during mopping. He smelled a strong odor of urine in the cell while large gnats flew around.

**89.** Dr. Spiehs could not retrieve the heavy safety blankets placed in the cell due to the sharp pain in his wrists, forearms, and back that prevented him from trying to lift them. He was unable to wrap the blankets around himself due to the weight and rigidity of the materials. As a result, he remained exposed to the cold air inside the cell. Throughout the evening, he observed gnats flying around inside the cell. There was no toilet or sink, instead a hole in the floor covered by metal bars was to be used to urinate and defecate in and emitted an odor that combined with the urine smell on the floor and could not be flushed from within the cell.

**90.** Dr. Spiehs attempted to stand and pace to stay warm, but each step caused pain in his back and arms. He repeatedly asked passing officers for water. He repeatedly asked passing officers and nurses for medical attention because of the injuries he had sustained during the forced stripping. Officers and nurses who passed by the cell could clearly see his condition through the large glass window on the cell door. He repeatedly asked staff to provide him with clothing and to dress him.

**91.** Officers could see Dr. Spiehs holding his arms stiffly, rubbing his wrists, and leaning against the wall for support. He told officers that his wrists felt as though they were severely injured from the cuffs being clamped onto his forearms. He also informed officers that he had significant pain in his back from being forced downward and manipulated through the portal. Despite these observable signs of injury and his repeated requests, no medical staff entered the cell to conduct an examination.

**92.** Between approximately 7:00 p.m. and 4 a.m., Dr. Spiehs remained naked inside the suicide-watch cell except for the heavy blanket he could not lift or wrap around himself. During that period, officers periodically walked past the cell window and looked inside. Each passing officer could see him standing naked or partially covered, holding his arms stiffly due to wrist and arm pain. He told multiple passing officers that his wrists and hands felt severely injured from the force used during the stripping. He informed these officers that his back hurt so badly he could not sit down. He requested to see medical staff on each of those occasions. Officers acknowledged hearing his requests but walked away without arranging for medical examination.

**93.** He remained standing for approximately nine hours because his back pain prevented him from sitting down. He continued pacing in the cold cell to avoid

shivering and observed that the temperature remained cold enough that his teeth chattered at several points during the night. His feet and legs became painful from standing.

**94.** Each time Dr. Spiehs attempted to bend slightly to adjust the blanket, sharp pain shot through his back and arms. He told officers and nurses he believed his wrists might be fractured because of the pain, discoloration, and swelling. None of the officers documented his injuries. None of the officers initiated any medical response.

**95.** Dr. Spiehs called out through the cell door to staff, stating that he had been injured during the stripping and needed medical attention. He informed staff that his wrists felt as though they had been fractured. He told staff that he could not move his arms normally and that pain was radiating down his spine. He asked staff how they could forcibly strip him but then refuse to examine the injuries caused by that force. He told staff, "Do no harm," addressing the medical personnel who walked nearby. Nurses walked past the cell window multiple times but did not enter the cell or ask him any medical questions nor did they ever appear concerned in the slightest for his medical condition and requests. He continued pacing because he remained unable to sit down due to pain in his back.

**96.** At approximately midnight, a nurse appeared at the cell window to examine his hands through the portal in the door. Dr. Spiehs had difficulty bending down and extending his arms through the portal. The nurse acknowledged the marks on his arms and the purple and white color of his hands and fingers but refused further assessment and treatment because he was naked and if he would not cover up. He told her that he physically could not cover up due to the pain he was experiencing in his hands, arms, shoulders, and back. Sgt White stood just to the side of the door listening to this interaction and while writing.

**97.** At approximately 12:45 a.m., the female lieutenant and several officers returned to the cell with a nurse. The lieutenant shouted through the door that they were not going to "come in" unless Dr. Spiehs sat on the ground against the far wall. He told the lieutenant he was physically unable to sit due to pain and offered to stand against the far wall for examination.

**98.** The female lieutenant rejected Dr. Spiehs's offer to stand and insisted he must sit on the ground. He again stated he could not bend or sit without severe pain. The lieutenant responded that he would not receive medical attention unless he sat on the floor. She then turned away from the cell, and the nurse and accompanying officers followed her away. No medical examination occurred during this second encounter. He remained without medical care despite having visible swelling, red marks, and wounds on his wrists and hands. His arms remained discolored, and he

continued feeling numbness and tingling in his fingers.

**99.** Throughout this period, Dr. Spiehs observed that the cell lights remained on continuously. His eyes became strained from the brightness of the lights. He continued pacing naked to try to manage the cold temperature in the cell. He told passing officers that he was freezing and asked for clothing or a blanket he could lift. Officers told him he would remain on suicide watch until morning. No officer told him he had been assessed by a mental-health professional. No officer told him when he would receive a suicide-risk evaluation.

**100.** At several points during the night, female staff walked past the cell window and looked directly at Dr. Spiehs's naked body. None of these staff members attempted to cover the window to provide privacy. Close to 4 a.m. he was able to sit down on the floor. He heard a female nurse outside the cell say to Lige, referring to him, "He's just sitting in there with his balls hanging out." He responded through the door, stating that he could hear everything being said. Lige acknowledged that the cameras were recording the conversation. The nurse did not retract or apologize for the comment. He told staff the comment was inappropriate and unprofessional and repeated that he had never felt more humiliated or degraded in his life and that the comment was sexual harassment.

**101.** Officers who walked by could see Dr. Spiehs shivering due to cold temperatures. He attempted to stand in a corner of the cell where he would be less visible through the window. The officers could still see him because of the size and angle of the window. He remained fully visible to staff and officers for the entire duration of his confinement. No staff member offered any privacy covering for the window.

**102.** As the night progressed, Dr. Spiehs's legs began to cramp from pacing. He attempted to crouch to rest but was unable to do so due to back pain. At approximately 4:00 a.m., he was finally able to lower himself into a seated position for the first time. He experienced pain while sitting and had difficulty supporting his upper body. He wrapped part of a heavy blanket across his lap to reduce exposure and continued shivering.

**103.** Dr. Spiehs observed that no staff member had conducted any suicide-risk evaluations during the night. He had not been asked a single mental-health question by any staff member since being placed in the cell. No documentation was presented to him about suicide watch. He had no access to a toilet other than the unsanitary hole in the floor. He was not provided soap, paper, or cleaning materials. He did not receive food overnight.

**104.** By the early morning hours, Dr. Spiehs's wrists remained visibly swollen and bore deep red impressions where the cuffs and forearm clamps had been applied. He

observed numbness in several fingers on both hands, particularly his left hand, where the skin had been broken during the forced stripping. He continued experiencing sharp, radiating pain down his spine whenever he attempted to change positions. His shoulders and upper back ached continuously from the pressure applied against the wall during the stripping. His legs cramped from standing and pacing for hours, and he struggled to shift his weight due to the cold floor.

**105.** Dr. Spiehs had not slept at any point during the night because the cell lights remained on continuously. He remained dehydrated. He had received no food since being brought to the jail on the evening of September 8. He used the toilet hole once during the night, and the smell of urine remained strong in the cell. He continued to observe gnats flying around the cell throughout the night and into the morning. He was never once offered to make a phone call the entire time he was in the jail.

**106.** Dr. Spiehs stated aloud several times that he did not understand why he was being held naked and isolated when he had not refused any lawful order. Officers walking by the cell did not respond to these statements. No staff member informed him of any timeline for release or evaluation. He remained unaware whether anyone outside the facility knew where he was. He had not been permitted to make a phone call at any point since his arrest.

**107.** At approximately 7:00 a.m. on September 9, a group of male officers including the bearded sergeant from the night before entered the medical-wing hallway to conduct morning rounds. The group approached the suicide-watch cells, including Dr. Spiehs's cell. He stood near the back wall, partially covered by the heavy blanket placed across his lap. The sergeant entered and saw his naked condition. A second sergeant told him he was performing a "body check," which required visual inspection of his body.

**108.** Dr. Spiehs asked the sergeant for an opportunity to make a phone call. The sergeant responded that he had "not complied" with providing an "emergency contact," and therefore he did not "need" a phone call. He informed the sergeant that no officer had asked him for an emergency contact at any point. He told the sergeant that he could call anyone, not just an emergency contact. The sergeant replied, "See, you're arguing again and not complying just like you did when you got arrested for disobeying police," and walked away. The sergeant did not document his request for a phone call. The sergeant did not ask him any mental-health questions related to suicide risk. No suicide-risk evaluation occurred during the body check. Dr. Spiehs informed the group of officers that he was unable to properly use the blanket due to his injuries and how heavy the blanket was and asked them to assist with putting it around him properly. It took 3 officers to do this.

**109.** At approximately 6:30 a.m., a new shift of nurses and corrections staff began arriving for morning duty. A nurse who had been present the night before approached Dr. Spiehs's cell and stated she remembered being on duty when he was brought in. This nurse expressed concern about the prior night's events and acknowledged he had been treated harshly. She told him she would return to conduct a proper medical examination after completing her initial rounds. The nurse informed him that SCDOC policy required a mental-health assessment every two hours for detainees placed on suicide watch. He informed the nurse that he had not received any assessment since being placed in the cell. The nurse expressed surprise that no assessments had been performed during the night and told him she would address the issue after completing her first round of checks.

**110.** During this brief conversation, Dr. Spiehs informed the nurse about the pain in his wrists, hands, and back. The nurse acknowledged his injuries and stated that a more thorough examination would occur shortly. Her remarks were audible to officers standing near the cell. No officer disputed the nurse's statement that he should have received mental-health evaluations. No officer provided any explanation for why no assessments had occurred. He continued to pace and rest intermittently while waiting for medical examination and remained naked except for the oversized blanket.

**111.** Approximately an hour later, at around 7:30 a.m., the same nurse returned to Dr. Spiehs's cell. The nurse instructed nearby officers to unlock the cell door so she could conduct an examination. He was permitted to leave the cell with the nurse to go to her office for the medical examination. The nurse visually examined his wrists, forearms, and hands. She observed swelling, discoloration, and lingering marks around both wrists and noted aloud that his hands had previously been purple and white, indicating reduced blood flow.

**112.** The nurse asked Dr. Spiehs to move his hands and fingers; he reported pain and difficulty moving them. She asked whether he had fallen or been struck; he explained that the pain resulted from the force used during the stripping. The nurse informed him she would report the injuries to supervisory medical staff.

**113.** After the nurse's examination, he was returned to the cell and a mental-health worker approached the cell. The worker stood outside the door and asked Dr. Spiehs if he was "feeling suicidal." He asked her if he didn't answer her questions would he be kept in the cell. She said that he would and that he would also be transported to Valeo community mental health. He stated clearly that he had not given any indication that he had been suicidal at any time. The worker did not ask any additional mental-health questions, did not enter the cell, and did not conduct a full

assessment. The worker told him he would "probably be getting out soon" and provided no explanation for why he had been placed on suicide watch in the first place.

**114.** Dr. Spiehs asked the worker whether any documentation had been created concerning suicide watch. The worker did not respond and walked away. No mental health documentation was provided to him during or after his confinement.

**115.** A corrections officer later approached the cell and informed Dr. Spiehs that his bond paperwork would be processed. He remained in the cell while staff discussed paperwork in the hallway. He was eventually instructed to stand near the door so officers could escort him out for processing. He was not given standard jail clothing and exited from the cell wrapped in the overly sized blanket that dragged behind when he walked and was so oversized that his feet did not touch the floor while walking due to the blanket being under his feet.

**116.** Dr. Spiehs was escorted to the booking area and released on an O.R. bond at approximately 11:00 a.m. on September 9, 2025—after more than sixteen hours in the suicide-watch cell and 20 hours in the jail.

### SEPTEMBER 9, 2025 - RELEASE AND IMMEDIATE AFTERMATH

**117.** When Dr. Spiehs exited the suicide-watch cell, he continued experiencing significant pain in his wrists, hands, forearms, shoulders, and back. His wrists were visibly swollen and still bore deep red and purple bands where the cuffs and forearm clamps had been applied. His left wrist displayed dried blood where the skin had been broken during the forced stripping. A knuckle on his left hand remained visibly scraped and bruised from the same force. He observed numbness and tingling in several fingers on both hands as jail staff escorted him to the booking area.

**118.** Dr. Spiehs attempted to move his fingers while walking to the booking area but experienced sharp pain when doing so. His forearms were marked with extensive deep red impressions consistent with being forcibly held and manipulated against the wall during the stripping. He walked slowly due to pain in his entire back, which had intensified after spending the night pacing and standing in the cold cell.

**119.** Dr. Spiehs had difficulty raising his arms while dressing into his clothing due to shoulder and back pain. He experienced a throbbing ache in his hands and wrists while buttoning or adjusting the clothing. His legs felt stiff and sore after pacing for many hours on the cell's hard, cold floor. His throat was dry, and he experienced dizziness when walking to the booking area.

**120.** After being released from SCDOC, Dr. Spiehs experienced immediate difficulty

using his hands to operate his vehicle due to pain in his wrists and fingers. He struggled to grip the steering wheel with his left hand and primarily used his right hand to drive. He experienced sharp pain when attempting to fully extend his fingers or wrists. His back pain intensified during the drive home due to prolonged standing the previous night and the forced manipulation of his body during the stripping. He felt a burning sensation in the muscles running from his lower back to his upper shoulders. He had difficulty sitting upright in his vehicle and had to frequently shift his weight.

121. Dr. Spiehs observed continued swelling in his wrists and hands once he arrived home. He kept his wrists elevated intermittently in an attempt to reduce swelling. He experienced difficulty holding everyday objects, including a phone, due to reduced grip strength caused by pain. He experienced difficulty lifting lightweight household items due to pain radiating up his forearms.

122. Dr. Spiehs observed bruising that developed over the next several hours across his wrists, forearms, and upper arms. He also observed faint abrasions along his chest and abdomen where officers' hands or forearms had pressed against his body during the forced stripping. His back pain worsened when bending forward to remove his shoes. He required several minutes to straighten his posture due to stiffness and pain. He remained in physical discomfort for the remainder of the day following his release.

## POST-RELEASE EMOTIONAL AND PSYCHOLOGICAL EFFECTS

123. Dr. Spiehs experienced persistent feelings of humiliation after being forcibly stripped naked in front of multiple female staff members. He replayed in his mind the comments made by staff, including the nurse's statement that he was "just sitting in there with his balls hanging out." He felt degraded by being observed naked by multiple staff members throughout the night without any privacy covering. He continued to feel fear due to recalling the moment when Sgt. White grabbed his fingers and shouted "Stop resisting," despite him not resisting. He recalled fearing that White might slam his head into the wall during the stripping procedure. He experienced anxiety throughout the day, thinking about the force used on him.

124. Dr. Spiehs was unable to sleep the night after his release due to the stress and physical pain. He felt disoriented due to the lack of sleep caused by the jail's bright lights being kept on continuously during the sixteen-hour confinement. He experienced shaking in his hands caused by a combination of pain, cold exposure, and emotional distress. He experienced intrusive recollections of the stripping procedure when attempting to relax or rest. He felt distressed by the repeated statements from jail staff suggesting he had "caused" the punishment by asserting his constitutional

right to remain silent. He continued to feel violated by the memory of having been forced to undress and held naked under conditions that he perceived as punitive and degrading.

**125.** Dr. Spiehs felt an ongoing sense of vulnerability due to officers' repeated statements that he would "stay in the cell until a judge sees you" because he had not answered their questions. He experienced significant distress knowing that no one outside the jail knew where he was during the twenty-hour confinement. His sense of personal dignity remained affected for weeks following the incident. He experienced heightened anxiety when encountering law enforcement or corrections settings after the incident. He felt a persistent sense of shock at the manner in which jail staff had treated him. He experienced emotional difficulty discussing the incident with others due to the humiliation he felt. He had difficulty concentrating on daily tasks immediately after the incident due to both physical discomfort and emotional distress. He continued to fear the possibility of retaliation or mistreatment from law enforcement after his release.

**126.** Dr. Spiehs's children did not know where he was during the night of September 8–9, 2025. His children experienced emotional distress when they were unable to contact him. His son and daughter were worried that he might have been harmed or hospitalized. His children attempted to call and text him during the night but received no response because he was not permitted to make a phone call at any time during his confinement. His children expressed fear upon learning that he had been taken to jail and not permitted to contact anyone. His children were distraught when they learned he had been held naked in a cold cell overnight.

**127.** Dr. Spiehs's children expressed concern about his physical condition when they saw the injuries on his wrists and arms. He felt distressed knowing his children had suffered emotional harm due to his inability to contact them. His family members were alarmed at the injuries he displayed upon returning home. His family expressed concern about his ability to perform basic tasks due to his back, wrist, and hand pain.

### POLICY VIOLATIONS AND SYSTEMATIC OBSERVATIONS

**128.** SCDOC policy, as described to Dr. Spiehs by the morning nurse, requires that any detainee placed on suicide watch receive mental-health checks at least every two hours. He received zero mental-health checks during his entire sixteen-plus-hour period of suicide-watch confinement. He was not asked any suicide-related questions before, during, or immediately after the forced stripping. He was not examined by any mental-health professional when placed on suicide watch. No suicide-risk assessment was performed before he was forcibly stripped. No staff member

documented any suicide-related statements from him. No staff member informed him that he had been placed on suicide watch due to any observed suicidal behavior.

**129.** Dr. Spiehs was not provided with any suicide-watch informational materials. He was not given a suicide-watch smock or any alternative to the heavy, non-pliable blankets. The suicide-watch cell lights remained bright, contrary to policies requiring dimmed or low-impact lighting conducive to observation and sleep. No staff member used a log sheet, clipboard, or electronic device to document suicide-watch checks. He heard staff discussing other suicide-watch detainees during the night, but none of those detainees were kept naked or denied assessments.

**130.** Dr. Spiehs was placed on suicide watch without any documented clinical justification. No mental-health professional made or approved the decision to place him on suicide watch. He was not evaluated or cleared by mental-health staff before release. He was not asked to sign any paperwork acknowledging suicide-watch placement. He was not informed post-release of any suicide-related concern or diagnosis. He understood from the statements of officers and nurses that the suicide-watch placement was used as punishment for refusing to answer non-identifying questions. No staff member attempted to correct or dispute his understanding that his silence—not any mental health concern—caused the forced stripping and isolation.

**131.** Throughout the forced stripping, Officer Bell stood in the doorway recording the procedure using a handheld camera. The handheld camera remained pointed steadily at Dr. Spiehs while his clothing was removed. The camera captured Sgt. White applying force to his hands, arms, and body. The camera captured his exposed condition as multiple male and female staff observed the stripping. The camera captured him telling officers that he was not resisting. The camera captured White shouting "Stop resisting!" and applying pain-compliance techniques. The camera captured him shouting that he would comply with lawful orders. He observed the handheld camera being used again around midnight as staff gathered outside his cell before the second attempted force. He understood that the handheld camera was used in part because staff anticipated additional use of force. He did not observe any staff member deactivate or destroy the handheld camera.

**132.** He believed that the handheld camera footage would corroborate the events described above. He did not receive any acknowledgment from staff regarding whether the video footage would be preserved.

**133.** Shortly after the stripping, officers outside the cell spoke audibly about Dr. Spiehs's refusal to answer questions. A female staff member stated, "He didn't want to answer our questions, so now he's here." He heard a male officer respond, "He'll

36

stay in there until he sees the judge." During the midnight encounter, Sgt. White stated directly to him that he had "caused this" by not answering intake questions. After the midnight encounter, officer Jackson whispered to him, "Do whatever you need to do to get out of this situation in the morning." He interpreted this statement as acknowledgment that answering questions—not safety—was the condition of release. The bearded sergeant who conducted rounds repeated that he had been "arguing again and not complying just like you did when you got arrested."

**134.** When Dr. Spiehs asked why he had been placed on suicide watch, no officer referenced suicide risk. All explanations referenced his silence or perceived "noncompliance." No staff member claimed that he had threatened self-harm. No staff member claimed that he had been crying, despondent, agitated, or otherwise displaying suicide indicators. Staff statements repeatedly tied his punishment specifically to his refusal to answer questions. No staff contradicted or corrected those statements. Staff maintained the same explanation throughout his confinement. Staff repeated these reasons to him during his morning medical evaluation and before release.

**135.** After his release, Dr. Spiehs elevated his wrists due to swelling and pain. He applied ice to his wrists and forearms intermittently throughout the day. He observed continued redness and discoloration around both wrists. He took over-the-counter pain medication to manage discomfort in his back and arms. He had difficulty performing routine household tasks, including preparing food, due to pain when lifting objects. He experienced ongoing difficulty sleeping due to back pain and emotional distress. He required several days before regaining full mobility in his wrists and hands. He experienced lingering pain in his entire back for weeks following the incident. He continued to experience difficulty bending or lifting heavy objects. He periodically experienced numbness in his fingers and hands for several days after the incident. He observed bruising along his forearms that remained visible for multiple days.

**136.** Dr. Spiehs experienced persistent anxiety and humiliation following the incident. He later sought medical evaluation regarding the injuries sustained at the jail. He continued to experience emotional distress when recalling the forced stripping.

**137.** Dr. Spiehs's physical pain limited his ability to perform daily work tasks requiring use of his wrists, hands, or back. He had difficulty typing or using a keyboard due to pain and swelling in his hands. He experienced difficulty carrying groceries or household items during the days following the incident. He found it painful to bend, kneel, or pick objects up from the floor. His children expressed

concern about his ability to care for himself due to his visible injuries.

**138.** Dr. Spiehs experienced emotional distress when explaining the incident to his family. He continued to feel humiliated by having been forcibly stripped naked while surrounded by both male and female staff. He remained fearful that future interactions with law enforcement or corrections officers might result in similar treatment. He continued to experience physical discomfort, emotional distress, and functional limitations as a result of the events described above.

**139.** In the days following his release, Dr. Spiehs continued to experience sharp pain in his wrists when attempting to rotate or flex them. He observed that swelling persisted around both wrists for several days. He experienced intermittent numbness in several fingers, particularly on his left hand, where the deepest impressions occurred. He continued to experience discomfort in his back when attempting to sit or bend forward. He required additional time to perform routine household tasks due to ongoing pain. His sleep continued to be disrupted by both physical discomfort and intrusive recollections of the stripping.

**140.** Dr. Spiehs experienced a racing pulse and tightness in his chest when recalling Sgt. White's loud shouts of "Stop resisting!" despite him not resisting. He had difficulty calming himself when recalling the moment his head was forced toward the concrete wall during the stripping. He felt significant anxiety when attempting to resume normal routines during the first several days after the incident. He continued to feel humiliated by remembering being forcibly stripped naked in front of multiple female staff members. He remained upset that jail staff had made sexualized comments about his exposed body.

**141.** Dr. Spiehs continued to feel degraded by remembering that the cell window allowed staff and officers to view his naked body for the entire sixteen-hour confinement. He experienced heightened sensitivity and discomfort when entering bathrooms or enclosed spaces after the incident. He felt increased fear and mistrust of law enforcement due to the events of September 8. He experienced recurring nightmares about the forced stripping and confinement.

**142.** Dr. Spiehs was not given access to a phone at any time during his confinement. He did not know whether his children or family were aware of his whereabouts. He experienced significant distress due to being unable to contact anyone while being held naked overnight. He later learned that his children were awake late into the night trying to reach him. His children continued calling and texting through the night of September 8–9, receiving no response. His children believed something had happened to him because he had never gone so long without checking in. His daughter cried upon learning that he had been in jail and unable to contact them. His son

expressed fear that he might have been injured or in danger. He later explained to his children that he had been prevented from contacting anyone.

**143.** Dr. Spiehs's children expressed continued worry about his physical and emotional condition. He found it emotionally painful to discuss the details of the forced nudity with his children. He experienced guilt due to the distress the incident caused them. He continued to field questions from his children about why the jail treated him in that manner. He experienced continued emotional distress while attempting to reassure them. His family members expressed fear about his future safety when interacting with law enforcement.

## OBSERVATIONS OF CUSTOMS AND PATTERNS

**144.** Dr. Spiehs observed that multiple officers and supervisors participated in or condoned the use of forced stripping as punishment. He observed that no staff member objected to the forced stripping at any point. He observed that staff communicated with one another in a manner suggesting forced stripping was a routine disciplinary tool. He heard staff members make statements indicating they viewed the stripping and suicide-watch placement as consequences for refusing to answer questions. He heard no staff member reference any safety protocol or health concern during the stripping procedure. He heard multiple staff members repeat that he "caused" the events by not answering questions. He was placed in a cell with bright lights, cold temperatures, and no privacy despite lacking any suicide indicators. He observed no documentation or monitoring consistent with suicide-watch policy requirements. He observed that medical staff followed instructions from corrections officers during the midnight encounter rather than conducting an independent medical evaluation. He observed that several nurses refused to enter the cell or treat him because he was naked, despite having been forcibly stripped moments earlier.

**145.** Dr. Spiehs observed that supervisory officers, including Sgt. White and the female lieutenant, personally directed or approved the actions taken against him. He heard staff discussing the June 14 incident, indicating the jail had a known pattern of threatening or using punitive measures against detainees who refused to answer intake questions. He observed that officers made no attempt to hide their conduct or statements from one another, suggesting such conduct was accepted within the facility. He observed that the handheld camera used during the stripping appeared to be readily available and used in anticipation of force. He heard no staff member discuss any requirement to obtain mental-health approval prior to placing a detainee on suicide watch. He observed that officers treated suicide watch as a discretionary disciplinary measure rather than a clinical decision. He observed that none of the

officers or staff expressed concern about deviating from policy or protocol. He observed that the female lieutenant openly mocked his requests for medical assistance. He observed that the facility lacked mechanisms to ensure detainees on suicide watch received timely evaluations. His observations indicated that multiple staff members, including supervisors, operated under customs and practices that permitted or encouraged punitive treatment of detainees who exercised their right to remain silent.

## INDIVIDUAL DEFENDANT PARTICIPATION

**146.** Sgt. White personally directed, supervised, and executed the forced stripping of Dr. Spiehs. White acted as the highest-ranking officer involved in the stripping procedure. White gave verbal commands to Lillo, Stanley, and Lige during the stripping. White personally applied pain-compliance techniques to Dr. Spiehs's hands and arms. White shouted "Stop resisting!" multiple times despite him not resisting. White forcibly removed his pants, underwear, and shirt. White applied handcuffs to his forearms—not wrists—with significant force. White was present during both midnight attempts to examine him and personally refused medical care. White stood directly outside his suicide-watch cell and told him he had "caused this." White made mocking gestures toward him while refusing medical attention.

**147.** Dr. Spiehs was physically restrained by Officers Lillo and Stanley during the stripping. Lillo held his left arm while Stanley held his right arm against the wall. Lillo and Stanley saw his bleeding knuckle and wrist marks but continued restraining him. Neither Lillo nor Stanley objected to White's force or instructions. Officer Lige stood within feet of the stripping and saw the entire event. Lige told him to "make it as easy as possible on yourself," implying the stripping would occur regardless of his cooperation. Lige did not intervene when White escalated force. Officer Bell filmed the stripping with a handheld camera. Bell stood close enough to clearly observe his exposed body and injuries. Bell did not intervene despite having complete visibility and the ability to call additional supervision.

**148.** Dr. Spiehs observed that officers appeared trained to use forced stripping as a control tactic rather than a clinically necessary suicide-prevention measure. He observed no formal involvement from mental-health professionals in the decision to strip or isolate him. He observed that staff deferred entirely to corrections officers for decisions requiring clinical judgment.

**149.** Dr. Spiehs observed that supervisors present during the stripping neither corrected nor questioned the actions of subordinate officers. He observed that no officer or supervisor took responsibility for ensuring policy compliance during his

confinement on suicide watch.

## STAFF STATEMENTS ESTABLISHING RETALIATORY MOTIVE

**150.** Dr. Spiehs observed that every staff member who interacted with him during the evening and night referenced "noncompliance" or "refusal to answer questions" as the reason he was being held. No staff member invoked any individualized assessment of suicide risk. No staff member expressed concern about him harming himself. Staff repeatedly communicated to him that answering intake questions was a prerequisite to release. He heard multiple officers and medical staff repeat similar statements about his refusal to answer questions, indicating a shared understanding among personnel. He observed that staff across ranks—including officers, sergeants, nurses, and lieutenants—used consistent language linking punishment to his silence. He observed that officers' statements to one another reflected agreement that the stripping and isolation were warranted because he "didn't answer." He heard one officer tell another officer, "He'll be staying there until the judge sees him," indicating an intent to prolong confinement until he complied.

**151.** Dr. Spiehs observed no internal disagreement, hesitation, or questioning among staff during or after the stripping procedure. He observed that no staff member attempted to consult written policy manuals or manuals stored near the intake area before making decisions about stripping and isolation. He observed that multiple officers and staff appeared to know the sequence of actions to take during the forced stripping, suggesting it was a familiar procedure. He observed that supervisory officers, including White and the female lieutenant, fully approved and furthered the actions taken against him. He observed that the female lieutenant's conduct during the midnight encounters demonstrated she was familiar with the practice of withholding medical care unless detainees complied with officer commands.

**152.** Dr. Spiehs observed that none of the officers documented his refusal to answer questions as indicative of suicide risk, despite claiming this refusal justified his placement on suicide watch. He observed that staff members appeared to treat suicide watch as a disciplinary measure, not as a clinical status requiring evaluation. He observed that the jail's system allowed officers, rather than mental-health staff, to determine suicide-watch placement. He observed that no review process existed to re-evaluate the placement decision during the night. He observed that during his confinement, the only action taken by mental-health staff occurred at approximately 9:30 a.m., more than 14 hours after placement. He observed that even then, the mental-health worker performed only a cursory, one-question check.

**153.** Dr. Spiehs observed that several officers discussed prior incidents in which

detainees were threatened with or placed on suicide watch for refusing intake questions. He understood these statements to indicate a pattern of using suicide watch for disciplinary purposes. He observed that officers communicated casually about stripping detainees, as though it was a normal and accepted practice. He observed that no officer expressed concern about the legality or appropriateness of forcibly stripping a detainee who had not shown suicidal intent. He observed that the handheld camera appeared to be used frequently in force-related situations. He observed officers discussing camera footage among themselves in casual tones, implying familiarity with recording such force events. He observed that medical staff deferred to corrections staff regarding decisions to withhold or provide medical care. He observed that nurses refused to examine him unless corrections staff instructed them to do so. He observed that nurses, corrections officers, and supervisors collectively participated in or enabled his prolonged deprivation of clothing and care.

154. Dr. Spiehs observed that officers acted with confidence that their actions were supported by existing jail practices. He observed that staff appeared unconcerned about potential documentation requirements or supervisory oversight. He observed that the jail's internal structure permitted supervisors to authorize or condone punitive measures without meaningful checks. He observed that multiple staff members discussed his conduct among themselves but not in a clinical or evaluative manner. He observed that staff treated his silence as a disciplinary offense rather than a constitutional right. He observed that no grievance or complaint mechanisms were available or offered to him during confinement.

155. Dr. Spiehs observed that staff offered conflicting explanations for why he had been placed in Cell 4C before the stripping. One officer told him the sergeant ordered the lock-in because he "didn't want to answer questions." Another officer told him the lock-in was to "keep him out of the way," though no explanation was provided. No officer claimed the Cell 4C placement was for suicide risk. He heard Officer Bell or Priest say, "That's the guy from June," indicating recognition of his prior refusal. He heard an officer say, "bond is stopped unless he answers," contradicting any notion that the procedure was about safety. He heard a nurse claim he had said he refused mental-health questions when he had remained silent. He immediately corrected the nurse, stating he never said he would refuse. He heard a nurse say, "Well he can take his ass to suicide watch then," showing retaliatory motivation.

156. Later, staff told Dr. Spiehs he had to "comply" by sitting on the floor to receive medical care, even though this requirement had not been communicated earlier. He observed that officers treated "compliance" with officer preferences—not safety criteria—as the operative standard. He heard the female lieutenant justify withholding medical care by claiming he "wasn't cooperating," though he was

physically unable to sit. He heard the bearded sergeant justify denying a phone call by claiming he "didn't give an emergency contact," though he had never been asked for one. He observed that staff repeatedly shifted explanations depending on the situation. He observed that none of the explanations matched suicide-watch policies.

## LONG-TERM PHYSICAL AND PSYCHOLOGICAL EFFECTS

**157.** In the weeks following the incident, Dr. Spiehs continued to experience periodic numbness in his fingers. He experienced recurring back pain requiring him to adjust his posture frequently during daily activities. He experienced trouble sleeping for several weeks due to nightmares about the stripping. He experienced feelings of humiliation when recalling being forced to stand naked in front of female staff for extended periods. He experienced heightened anxiety when driving past SCDOC after the incident. He had difficulty relaxing in enclosed rooms due to memories of the suicide-watch cell. He continued to feel discomfort when removing clothing due to memories of being forcibly stripped.

**158.** He experienced intrusive recollections of Sgt. White's aggressive demeanor, had recurring thoughts about how easily the force escalated, and had difficulty exercising due to wrist and back pain. He experienced anxiety about returning to any government building, including police stations or county offices. His children remained fearful that future encounters with police could lead to similar treatment and found it difficult to explain the incident to others due to the intimate and humiliating nature of the stripping. He felt an ongoing sense of vulnerability and fear of retaliation from law enforcement and continued to experience emotional distress each time he saw the clothing he had worn to jail that day.

## COMPREHENSIVE SUMMARY OF CONFINEMENT TIMELINE

**159.** Dr. Spiehs was arrested on September 8, 2025 and was taken to SCDOC intake in the afternoon hours of September 8. He was placed on suicide watch at approximately 6:45 p.m. and remained on suicide watch for more than sixteen hours until approximately 11:00 a.m. on September 9. He did not receive any mental-health evaluation until shortly before release, when a single question was asked. He did not receive any medical examination until after approximately fourteen hours of confinement and did not receive clothing until immediately before his release. He was not allowed a phone call at any time during his detention nor was he informed of any charges or safety concerns justifying the punishment he received. He left SCDOC with visible injuries, physical pain, emotional distress, and difficulty using his hands,

wrists, and back. After bonding out of SCDOC on the morning of September 9, 2025, he immediately observed severe swelling in both wrists extending several inches up his forearms. He suffered red, linear pressure marks circling both forearms where Sgt. White had clamped the handcuffs onto his arms instead of his wrists. He experienced continuing numbness in both hands for several days following his release. He also experienced radiating pain into his shoulders and upper back consistent with the strain and torque applied while his arms were forcibly pinned during the stripping procedure.

### DETAILED PHYSICAL AND PSYCHOLOGICAL TRAUMA

**160.** His back and neck pain persisted for weeks following his release. He had difficulty sleeping because of the injuries caused during his confinement. He had difficulty performing routine daily tasks because bending, lifting, or twisting movements triggered sharp pain in his back. He continued to experience intermittent shooting sensations down his spine consistent with nerve compression caused during the stripping procedure. He experienced emotional distress following the events at SCDOC. He experienced recurring intrusive recollections of being stripped naked while restrained by multiple officers. He experienced recurring intrusive recollections of Sgt. White yelling "Stop resisting!" even while he was pinned and unable to move. He experienced intrusive recollections of the moment his pants and underwear were forcibly removed. He experienced intrusive recollections of being held naked against the wall with multiple officers surrounding him.

**161.** Dr. Spiehs experienced intrusive recollections of multiple female staff observing his naked body as he was forcibly restrained. He experienced recurring intrusive recollections of Sgt. White's mocking "blah-blah-blah" gesture. He experienced recurring recollections of being told by staff that he "had caused this" because he did not answer questions. He experienced panic-like symptoms when recalling the moment Sgt. White clamped the handcuffs around his forearms. He experienced humiliation at being forced to stand naked in a cold cell for more than nine hours with no ability to cover himself. He experienced fear that he would be left in the cell indefinitely. He experienced fear that he would be harmed again if he attempted to seek medical attention. He experienced difficulty concentrating for several days following his release. He experienced increased anxiety entering public buildings following his release. He experienced increased apprehension around law enforcement officers following his release. He experienced difficulty trusting staff at any correctional or medical facility following his release. He experienced fear that returning to the police station to pursue his criminal report would result in retaliation. He remained reluctant to enter the Topeka Police Department building

due to fear of further unlawful detention. He experienced recurring nightmares in which he was again pinned against a wall and stripped.

**162.** He experienced nightmares replaying Sgt. White shouting "Stop resisting!" despite his compliance. He experienced nightmares involving being watched by staff while naked. He experienced nightmares involving being trapped in a small, cold room without clothing. He experienced sleep disturbances consistent with trauma from the events. He experienced prolonged feelings of shame following the forced stripping. He experienced a loss of sense of safety in public facilities following the incident. He experienced hypervigilance in public spaces. He experienced avoidance of any environment resembling a jail or detention facility. He avoided discussing the incident with others due to feelings of humiliation.

**163.** He experienced physical reminders of the event whenever he saw marks on his wrists or forearms. He experienced emotional distress upon recalling the denial of medical care during his confinement. He experienced distress upon recalling the mocking sexual comment made by the nurse.

**164.** He experienced distress recalling that he did not receive any suicide-risk assessment during his confinement. He experienced distress recalling that staff repeatedly linked his punishment to his refusal to answer questions. He experienced distress recalling that no staff member attempted to intervene on his behalf during the stripping procedure. He experienced distress recalling that no staff member attempted to intervene to provide medical care throughout the night. He was aware that the events were recorded on video according to staff statements. He was informed that the jail had recently completed a $3 million camera upgrade. He was aware that the stripping procedure was recorded on a handheld camera operated by Officer Bell. He was aware that many parts of the medical wing were under continuous surveillance. He was aware that his confinement on suicide watch was also recorded by fixed cameras. He was aware that the staff comments, mocking gestures, and refusal to provide medical care were likely captured on video.

## LACK OF DOCUMENTATION AND PROCEDURAL SAFEGUARDS

**165.** Dr. Spiehs requested no documentation or paperwork explaining the basis for his placement on suicide watch because none was offered. He was given no written explanation of the criteria used to determine that he posed a suicide risk. He was given no written explanation of the criteria necessary to be removed from suicide watch. He was not presented with any form documenting a suicide assessment.

**166.** He received no mental-health screening until after he had already bonded out.

He did not observe any staff member complete suicide-watch paperwork on his behalf. He was never asked any questions relating to self-harm before being stripped. He was never asked any questions relating to a mental-health history before being stripped. He was never asked any questions relating to safety concerns before being stripped. He was never asked any questions relating to suicidal ideation after being stripped. During his entire confinement on suicide watch, no mental-health worker entered his cell. No staff member performed the required two-hour suicide-watch checks referenced by the morning nurse.

**167.** He was not provided any protective clothing associated with legitimate suicide-watch protocols. He was not given a suicide-resistant smock. He was not given suicide-resistant bedding. He was placed in a cold cell with only heavy blankets he could not physically manipulate because of the injuries caused by staff. He was never informed that any written policy or law required him to answer non-identifying questions.

**168.** He was never informed that refusal to answer questions could result in forced stripping. He was never informed that refusal to answer questions could result in being held overnight without access to a phone. He was never informed that refusal to answer questions could affect his ability to bond out. He was informed by Bell that his bond had been stopped because he did not answer questions. He was informed by staff that he "would stay in the cell until he saw a judge" because he did not answer questions. He was told by officers that he "had caused this" by not answering questions. He was told by staff that he could not receive medical attention unless he answered questions. He was told that he would be taken to Valeo mental health unless he answered questions.

**169.** He observed no written policy posted in the jail stating that medical care or release was conditioned on answering questions. He observed no written policy posted stating that refusal to answer questions constituted a safety risk. He observed no written suicide-watch policy posted in the jail. He was never told his placement was based on any mental-health professional's decision. He was never told a mental health professional had been consulted before his placement on suicide watch. He was never told that a mental-health professional supported the forced stripping. He was never told that a mental-health professional was notified of the stripping procedure. He was never told that a mental-health professional authorized the use of force. He was never told whether the jail's policy required supervisory authorization for forced stripping.

**170.** Dr. Spiehs was never told whether Sergeant White or the female lieutenant had authority to order suicide-watch placement. He was never told whether the bearded

sergeant had authority to order extended confinement in Cell 4C. He was never given an opportunity to speak to a supervisor other than those directly involved. He was never given an opportunity to speak to a mental-health professional before the stripping. He was never given an opportunity to speak to a medical professional before the stripping. He did not observe any written record being made documenting what occurred in the medical-wing cell. He was not shown any written justification for the level of force used. He was not shown any written justification for the stripping procedure. He was not shown any written justification for the continued naked confinement. He was not shown any written justification for being denied medical care overnight.

**171.** He was not provided any grievance form during his confinement. He was not informed of any method to request review of his treatment. He was not informed of any internal investigation into his treatment. He was not informed that any staff member had reported the incident. He was not informed that any supervisor had reviewed the stripping video. He left the facility on September 9, 2025, still experiencing pain, humiliation, physical injuries, and emotional trauma resulting from his treatment.

Although the foregoing sworn statement is written in the third person, I declare under penalty of perjury pursuant to U.S.C. § 1746 that the foregoing is true and correct. References in the Complaint to other persons using "he" or him, including Defendants, are not verified by me except insofar as they describe my own observations or experiences.

Executed on 12/11/2025

Dr. Justin Spiehs

47